## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Jorrell Lambert,

                    Plaintiff,          Case No. 21-12929

v.                                      Judith E. Levy
                                        United States District Judge
City of Saginaw and Jonathon
Beyerlein,[1]                           Mag. Judge Patricia T. Morris

                    Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT [21]

This case arises out of Defendant Jonathon Beyerlein's use of force

against Plaintiff Jorrell Lambert on April 5, 2019 at the Saginaw County

Jail following Plaintiff's arrest. The incident was recorded by the body

---

[1] The parties have referred to the individual Defendant as both "Jonathan Bayerlein" and "Jonathan Beyerlein" in their filings. (*See, e.g.* ECF No. 1, PageID.1, 3; ECF No. 14, PageID.59–60; ECF No. 21, PageID.94–99; ECF No. 21-2, PageID.111.) Prior to the entry of this opinion and order, the Court confirmed with Defendants' counsel that "Jonathon Beyerlein" is the correct spelling. The Court will therefore direct the Clerk's Office to update the docket in this case accordingly.

cameras worn by Beyerlein and two other officers.[2] Plaintiff subsequently filed this action against Beyerlein and Defendant City of Saginaw. (ECF No. 1.) He asserts claims for excessive force under 42 U.S.C. § 1983, assault and battery under state law, and municipal liability under *Monell*.

Before the Court is Defendants' motion for summary judgment. (ECF No. 21). In their motion, Defendants assert that Plaintiff has not presented evidence of excessive force, Beyerlein is entitled to qualified immunity, and Plaintiff has failed to show that the City of Saginaw can be found liable under *Monell*. For the reasons set forth below, Defendants' motion is DENIED.

---

[2] These three videos are referenced in Plaintiff's response to Defendants' motion for summary judgment as Exhibit 1. (*See* ECF Nos. 28, 28-1.) Pursuant to Rule 19(c) of the Eastern District of Michigan's Electronic Filing Policies and Procedures, Plaintiff uploaded these videos to the Court's ECF system and filed a transcript for each video. (*See* ECF Nos. 31, 33-1.) In this opinion, the Court adopts the following convention when referencing these videos, with "X:XX" referring to a time stamp: "([Officer Last Name], [X:XX]–[X:XX].)"

## I.    Background

### A.    Plaintiff's Arrest and Transport to the Saginaw County Jail

In the early hours of April 5, 2019, Plaintiff called the police related to a dispute with his girlfriend.[3] Three officers from the Saginaw Police Department responded to Plaintiff's address—Beyerlein, Steven Lautner, and Alex Mawer. After obtaining Plaintiff's information, Beyerlein "ran him a lien"[4] and discovered that Plaintiff had an outstanding warrant for failure to register as a sex offender.[5] (ECF No.

---

[3] In his deposition, Plaintiff testified that he returned home from work to find his girlfriend, who was "three to four months pregnant" with his child, drinking alcohol. (ECF No. 28-3, PageID.258–259.) He further testified that he "called the police" because he "thought they would help." (*Id.*) However, while being transported to the Saginaw County Jail, Plaintiff stated: "My b[****] beat my ass, I called you all." (Lautner, 1:25–1:30; ECF No. 33-1. PageID.661; *see also* Mawer, 9:40–9:50 ; ECF No. 33-1 ("This b[****] that scratched my eye, punched me, beat me, tried to stab me.").) Officer Alex Mawer testified, based on his initial report, that the officers "were dispatched to a reference, nature unknown, that a male was yelling that he needed police, that he was being attacked." (ECF No. 28-5, PageID.409.)

[4] "Lien" undoubtedly refers to Michigan's Law Enforcement Information Network (LEIN), a computerized database that provides the names of individuals with outstanding warrants.

[5] During his arrest and at his deposition, Plaintiff contended that the officers made up the warrant to justify his arrest. (ECF No. 21-3, PageID.139.) However, the relevant docket from Saginaw County Circuit Court reflects a warrant for felony failure to register as a sex offender that was entered into LEIN on March 28, 2019. *See People v. Lambert*, No. 19-046177-FH (Mich. Cir. Ct. Sept. 9, 2019).

28-4, PageID.326; ECF No. 33-1, PageID.661–662.) Based on the warrant, the officers took Plaintiff into custody and handcuffed him behind his back. The officers testified that Plaintiff was also arrested on probable cause for domestic violence. (*See* ECF No. 28-6, PageID.437; ECF No. 28-4, PageID.324–326.) Plaintiff was placed in Lautner and Mawer's patrol car and driven to the Saginaw County Jail. Beyerlein drove to the jail separately.

## B.    Plaintiff's Arrival at the Saginaw County Jail

Upon arrival at the Saginaw County Jail, Beyerlein placed his firearm in a locker in the sallyport. (Beyerlein, 0:13–0:20.) A few moments later, Lautner and Mawer arrived and placed their firearms in the trunk of their vehicle. (*Id.* at 0:34–0:43; Lautner, 1:58–2:08.) Plaintiff exited the patrol car while still handcuffed behind his back. (Beyerlein, 1:00–1:08.) Mawer patted Plaintiff down, confirming he did not have a weapon on him. (*See id.* at 1:15–1:28.) During this time, Plaintiff was vocal with the officers, asking the officers to look at his DD214[6] in his

---

[6] "DD214" appears to refer to Plaintiff's discharge papers from the United States Navy.

4

wallet and insisting that he did not have a warrant. (*Id.* at 1:05–1:34; ECF No. 33-1, PageID.648–649.)

Following Mawer's pat down, Lautner opened a metal door to a short hallway between the sallyport and the booking area. (Beyerlein, 1:30–1:33; Lautner, 2:42–2:54.) The hallway consists of a sloped concrete walkway with a holding cell on the right side and a second door at the other end. (*See* Beyerlein, 1:34–1:38.) Beyerlein explained that "[y]ou can't open the second door until that first door is shut and locked and secured." (ECF No. 28-4, at PageID.332–333.) Plaintiff entered the hallway, followed by Beyerlein, then Mawer, and then Lautner. (*See* Beyerlein, 1:32–1:41; Lautner, 2:42–2:58.)

## C.   Beyerlein's Use of Force Against Plaintiff

While in the hallway, Plaintiff continued to express his frustration to Beyerlein related to his arrest. (*See* Beyerlein, 1:35–1:44; ECF No. 33-1, PageID.649–650.) Plaintiff stated to Beyerlein: "N[*****], I ain't got no f[****]ing warrant. You a liar. I got pulled over last week." (Beyerlein, 1:41–1:44; ECF No. 33-1, PageID.649–651.) Beyerlein responded: "I don't care. You got a warrant." (Beyerlein, 1:44–1:45; ECF No. 33-1, PageID.650.) During this interaction, Beyerlein pushed the door to the

booking area open with his left hand. (Mawer, 0:08–0:12.)[7] Plaintiff turned toward the door and began walking forward. (*Id.* at 0:11–0:13.) As Plaintiff did so, Beyerlein used his right hand to grab Plaintiff's left arm.[8] (*Id.*; Beyerlein, 1:44–1:46.) In response, Plaintiff pulled away from Beyerlein and asked why Beyerlein was touching him. (Beyerlein, 1:44–1:46; *see also* Mawer, 0:08–0:13.)

Beyerlein attempted to gain control of Plaintiff by grabbing the handcuffs on Plaintiff's wrists. (Beyerlein, 1:44–1:46.) He testified that he "tried to lift [Plaintiff's] hands and arms," but he was unable to do so

---

[7] The video from Mawer's bodycam begins as Plaintiff is entering the hallway and does not appear to contain any audio until 0:29.

[8] Beyerlein explained at his deposition:

I was trying to hold onto his hands and/or wrist so I could escort him through that second door, because as I started to say before, you need to step in and then go to the right. Otherwise, that door is going to come back and hit you.

So it was common to say [s]tep in and go to the right. Otherwise, the door is going to hit you. The counter is to the left but you have to wait for the door to close to walk around the door.

So I was trying to escort him through to get him to the counter but there's a path to take to not get hit by a heavy metal closing door.

(ECF No. 28-4, PageID.334–335.) However, the video does not reveal that Beyerlein attempted to give Plaintiff these instructions. (*See* Beyerlein, 1:40–1:49.)

because Plaintiff "continued to pull away." (ECF No. 28-4, PageID.336–337.) As this happened, Plaintiff continued to move forward and attempted to turn back to face Beyerlein. (Mawer, 0:14–0:16; *see also* Beyerlein, 1:46–1:49.) Plaintiff also exclaimed, "I've got cuffs on me, bro[!]" (Beyerlein, 1:48–1:49; ECF No. 33-1, PageID.650.) Beyerlein then made an initial attempt to take Plaintiff to the ground but was unsuccessful. (Mawer, 0:15–0:17.) He then made a second attempt at a takedown, slamming Plaintiff onto the floor head-first.[9] (*Id.* at 0:17–0:21; Lautner, 3:09–3:11; *see also* ECF No. 28-3, PageID.267–268.) Throughout this interaction, Plaintiff's hands remained handcuffed behind his back. (Mawer, 0:00–0:29; *see also* ECF No. 28-4, PageID.301.)

Immediately after the incident, Beyerlein stated to another officer: "He started grabbing on my arm, twisting my uniform." (Beyerlein, 2:21–2:25; ECF No. 33-1, PageID.651.) When approached by another officer several minutes later, Beyerlein explained: "[H]e was just grabbing my arm and wouldn't let go, so. . . . That's why I took him down because he

---

[9] Beyerlein testified that he did not attempt to perform a particular takedown technique, had not used the takedown in the past, and had not been trained on the takedown he used on Plaintiff. (ECF No. 28-4, PageID.311, 339.) He explained: "What I intended was to pull him back down on top of me using me as that cushion." (*Id.* at PageID.311–312.)

wouldn't let go of my arm." (Beyerlein, 4:51–5:02; ECF No. 33-1, PageID.654.) During his deposition, Beyerlein testified that as he and Plaintiff moved into the booking room, Plaintiff "wrapped his hands around my shirt sleeve . . . to where I couldn't pull my hands away from him, so he was restricting my mobility and then dug his fingernail into my wrist." (ECF No. 28-4, PageID.306–307; *see also id.* at PageID.338 (describing the pain as "a little uncomfortable and starting to hurt").)

It is not clear from the videos if or when Plaintiff grabbed Beyerlein's uniform or dug his fingernails into Beyerlein's wrists. However, Plaintiff's hands can be seen on Beyerlein's bodycam at several points during the brief altercation. (*See* Beyerlein, 1:45–1:49.) In his testimony, Beyerlein indicated that Plaintiff grabbed his shirt sleeve after the initial takedown attempt.[10] (*See* ECF No. 28-4, PageID.337–338.) Consistent with this timing, Beyerlein appears to first exclaim "Let go of me!" as he is making his second takedown attempt. (Lautner, 3:07–3:12; *see also* Beyerlein, 1:48–1:52.) Beyerlein did not give Plaintiff any

---

[10] Beyerlein's report described this as an attempt to push Plaintiff to the booking counter and pin him against it. (ECF No. 28-4, PageID.337.) But the video from Mawer's bodycam shows Beyerlein pushing Plaintiff's head down towards the ground with his left leg extended in front of Plaintiff's legs. (Mawer, 0:15–0:16.)

other commands during the altercation. (*See* Beyerlein, 1:43–1:53.) Mawer took photos of the red marks on Beyerlein's left wrist several minutes after the incident. (Mawer, 7:07–7:27; *see also* ECF No. 28-4, PageID.338–339 ("It's a scratch with a nail mark indentation in the center.").) Plaintiff testified that Beyerlein was "lying, say[ing] I scratched him" (ECF No. 28-3, PageID.263) and that Beyerlein "grabbed me by my shoulder, yanked me, and then that's all I remember." (*Id.* at PageID.267.)

### D.   After Beyerlein's Use of Force

Following the takedown, Mawer and Lautner assisted in restraining Plaintiff. (Lautner, 3:10–3:32; Mawer, 0:20–0:40.) There were also at least three other officers present in the booking area at the time of the takedown who responded within seconds. (*See* Lautner, 3:32–3:42; Mawer, 0:20–45; *see also* ECF No. 28-4, PageID.327.) Shortly after the takedown, Plaintiff appeared to lose consciousness. (*See* Mawer, 0:21–0:38; ECF No. 33-1, PageID.651 ("Now you're sleeping?").) When two other officers lifted Plaintiff up off the floor by his arms, Plaintiff's body remained limp and his head fell forward. (*See* Mawer, 0:39–0:46; Beyerlein, 2:12–2:20.)

A nurse then examined Plaintiff and identified that Plaintiff had blood coming out of his ear. (*See* Beyerlein, 2:52–3:05.) Beyerlein confirmed that Plaintiff was not previously bleeding from his ear. (*Id.* at 3:06–3:10; *see also* ECF No. 28-4, PageID.351.) The nurse then asked Plaintiff, "Do you know where you are?" (Beyerlein, 3:12–3:22; ECF No. 33-1, PageID.651–652.) Plaintiff responded: "No. I'm from Detroit." (*Id.*) The nurse reiterated, "No, but do you know where you are right now?" (*Id.*) Again, Plaintiff responded, "No." (*Id.*) A few moments later, Plaintiff questioned why the two officers were holding onto him and one of the officers responded, "You act like you're going to fall over." (Beyerlein, 3:46–3:56; ECF No. 33-1, PageID.652.) Jail staff determined that Plaintiff should be transported to the hospital to be medically cleared. (ECF No. 28-4, PageID.351–352.) Plaintiff was then transported to the hospital by Lautner and Mawer. (*Id.*; *see* Mawer, 5:53–16:19.) As a result of the incident, Plaintiff experienced a broken eardrum, skull fractures, hearing loss, a concussion, headaches, migraines, the loss of several teeth, the loss of smell and taste, and insomnia. (*See* ECF No. 28-3, PageID.268–278.)

Plaintiff was subsequently charged with felony resisting, obstructing, and assaulting a police officer pursuant to Mich. Comp. Laws § 750.81d(1). (ECF No. 28-9, PageID.532.) The case went to trial, and Beyerlein testified. (*See* ECF No. 28-4, PageID.306.) On November 23, 2021, a jury found Plaintiff not guilty. (ECF No. 28-9, PageID.533.)

### E.   Procedural History

Plaintiff filed the complaint in this case on December 15, 2021. (ECF No. 1.) The complaint includes claims against Beyerlein for excessive force under 42 U.S.C. § 1983 and state law assault and battery. Plaintiff also asserts a *Monell* claim for municipal liability against the City under § 1983. On February 7, 2022, Defendants filed an answer. (ECF No. 11.) The case then proceeded to discovery. (*See* ECF No. 15.) On March 30, 2023, Defendants filed the present motion for summary judgment. (ECF No. 21.) Plaintiff filed a response (ECF No. 28), and Defendants replied. (ECF No. 37.) On October 19, 2023, the Court held a hearing and heard oral argument on Defendants' motion.

## II.   Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

When a video captures the events underlying the summary judgment motion, courts must "rely mainly on undisputed video footage from . . . the scene." *Ashford v. Raby*, 951 F.3d 798, 800 (6th Cir. 2020); *see also Lang v. City of Kalamazoo*, 744 F. App'x 282, 286 (6th Cir. 2018). In evaluating a defendant's motion for summary judgment, courts must "adopt the plaintiff's version of any facts not caught on film." *Ashford*, 951 F.3d at 800 (citing *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)). Additionally, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving

party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015)).

## III.   Analysis

### A.   Plaintiff's § 1983 Claim Against Beyerlein

Defendants' motion first seeks summary judgment on Plaintiff's claim for excessive force against Beyerlein under 42 U.S.C. § 1983. (ECF No. 21, PageID.101–104.) In support of their motion, Defendants assert that Plaintiff cannot prove that Beyerlein used excessive force and that, in any event, Beyerlein is entitled to qualified immunity. (*Id.*)

"Section 1983 provides a cause of action against any person who, under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution and federal law." *McKnight v. Rees*, 88 F.3d 417, 419 (6th Cir. 1996). Qualified immunity is an affirmative defense to § 1983 claims. *Regets v. City of Plymouth*, 568 F. App'x 380, 386 (6th Cir. 2014). When properly invoked, "qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'"[11]
*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). If a defendant asserts qualified immunity, the plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity. *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (citing *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011)). To meet this burden, the plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

### i.    Constitutional Violation

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. However, under the Fourth Amendment, police officers have discretion "to use some degree of physical coercion or threat thereof" when making an arrest. *Wright v. City of Euclid*, 962 F.3d 853, 865 (6th Cir. 2020) (quoting *Graham v. Connor*, 590 U.S. 386, 396 (1989)). As a result, the Supreme Court has

---

[11] In recent years, an increasing number of scholars and courts have questioned the origins of qualified immunity and its viability going forward. *See, e.g.*, Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201 (2023); *Green v. Thomas*, No. 3:23-CV-126-CWR-ASH, 2024 WL 2269133, at *4–8, *17–25 (S.D. Miss. May 20, 2024) (Reeves, J.).

held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395 (emphasis omitted). The Sixth Circuit has explained that claims based on excessive force by the arresting officers during the booking process are likewise analyzed under the Fourth Amendment's reasonableness standard. *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010) (citing *Phelps v. Coy*, 286 F.3d 295, 300–01 (6th Cir. 2002)).

To determine whether the force used was reasonable, courts balance "'the nature and the quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Additionally, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Wright*, 962 F.3d at 865 (citation omitted). This is because reasonableness is an objective inquiry that asks "whether the officers' actions are 'objectively reasonable' in light of the facts and

circumstances surrounding them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

In excessive force cases, courts in the Sixth Circuit must look to the totality of the circumstances when evaluating whether a particular level of force was justified. *Wright*, 962 F.3d at 865 (citing *Coffey v. Carroll*, 933 F.3d 777, 588 (6th Cir. 2019)). When engaging in this analysis, the Sixth Circuit considers the following "*Graham* factors": "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (alterations in original) (quoting *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006)).

Here, Defendants contend that Beyerlein's use of force against Plaintiff was objectively reasonable but fail to address the *Graham* factors in any meaningful detail. (*See* ECF No. 21, PageID. 101–102; ECF No. 37, PageID.696–697.) Plaintiff disagrees and asserts that each of the *Graham* factors weigh in his favor. (*See* ECF No. 28, PageID.207–214.) The Court addresses each of the factors in turn.

16

a.   <u>Severity of the Crime at Issue</u>

First, the Court considers the severity of the underlying crime. *Wright*, 962 F.3d at 865. Under this *Graham* factor, "[c]onduct that is not a violent or serious crime does not permit an officer to use increased force absent other factors." *See Vanderhoef v. Dixon*, 938 F.3d 271, 277 (6th Cir. 2019) (citation omitted); *see also Shumate v. City of Adrian, Michigan*, 44 F.4th 427, 442 (6th Cir. 2022) (finding the first *Graham* factor weighed in favor of the plaintiff where there was no indication that "any offense committed could properly be considered severe").

Here, Beyerlein took Plaintiff into custody due to an outstanding warrant for failure to register as a sex offender. (*See* ECF No. 28-4, PageID.326; ECF No. 33-1, PageID.661–662.) Under Michigan law, failure to register as a sex offender can be a felony; however, it does not include an element of violence. *See* Mich. Comp. Laws § 28.729(1). And Beyerlein acknowledged that Plaintiff's warrant was for a non-violent offense in his deposition. (*See* ECF No. 28-4, PageID.326.)

However, the officers testified that Plaintiff was also arrested on suspicion of domestic violence. (*See id.* at PageID.324–326; ECF No. 28-6, PageID.437.) Under Michigan law, domestic violence can be either a

17

misdemeanor or a felony offense depending on the outcome of the state's investigation of the incident. *See Kapuscinski v. City of Gibraltar*, 821 F. App'x. 604, 609 (6th Cir. 2020); Mich. Comp. Laws § 750.81. Beyerlein further testified that the officers observed "one or two holes poked into the drywall . . . about the size of the end of a baseball bat" along with "fresh drywall dust and debris on the bed, pillows and blankets of the bed." (ECF No. 28-4, PageID.325.) This was consistent with Plaintiff's girlfriend's assertion to Beyerlein that Plaintiff threatened her with a baseball bat. (*Id.*) Plaintiff fails to point to any evidence in the record that contradicts Beyerlein's testimony regarding the alleged domestic violence or even discuss the arrest for alleged domestic violence.

Given the unrebutted evidence regarding Plaintiff's arrest for domestic violence, the Court concludes that the first *Graham* factor weighs in favor of Beyerlein. Nevertheless, the Court notes that Plaintiff was already handcuffed and inside the Saginaw County Jail at the time of Beyerlein's use of force. Moreover, Plaintiff complied with the officers' commands and did not resist when initially arrested at the scene. (*See* ECF No. 28-3, PageID.261.) As such, this factor does not carry significant weight in the Court's analysis.

18

b.   <u>Whether Plaintiff Posed an Immediate Threat to the Safety of the Officers or Others</u>

The Court next considers whether Plaintiff posed an immediate threat to the safety of the officers or others. *Wright*, 962 F.3d at 865. Here, it is undisputed that Plaintiff was handcuffed behind his back while he was being escorted from the patrol car into the Saginaw County Jail booking area. (*See* Mawer, 0:00–0:29; *see also* ECF No. 28-4, PageID.301.) Plaintiff was patted down for weapons by Mawer upon his arrival at the jail, which Beyerlein observed. (Beyerlein, 1:15–1:28; *see also* ECF No. 28-4, PageID.301.) All three officers secured their firearms prior to Mawer removing Plaintiff from the patrol car. (Beyerlein, 0:13–0:20, 0:34–0:43; Lautner, 1:58–2:08.) Mawer and Lautner followed Beyerlein and Plaintiff into the hallway leading to the booking area and were immediately behind Beyerlein at the time of the incident. (*See* Beyerlein, 1:32–1:41; Lautner, 2:42–2:58.) Further, there were at least three additional officers present in the booking area who responded within seconds of the incident. (*See* Lautner, 3:32–3:42; Mawer, 0:20–45; *see also* ECF No. 28-4, PageID.327.)

As such, the Court concludes that Plaintiff did not pose an immediate threat to Beyerlein or others. *See Harris v. City of Circleville*,

19

583 F.3d 356, 366 (6th Cir. 2009) (holding that the plaintiff who was handcuffed and surrounded by at least three officers within a jail "did not pose an immediate threat" to the officers or others); *Meirthew v. Amore*, 417 F. App'x 494, 497 (6th Cir. 2011) (holding that a plaintiff who was "unarmed, handcuffed, and surrounded by police officers" in a police station "did not pose an immediate threat"). Thus, the second *Graham* factor weighs in favor of Plaintiff.

c. <u>Whether Plaintiff was Actively Resisting Arrest or Attempting to Evade Arrest by Flight</u>

Finally, the Court considers whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight. *Wright*, 962 F.3d at 865. As an initial matter, Beyerlein, Mawer, and Lautner all testified that Plaintiff did not pose a risk of flight when he was being escorted into the booking area, where Beyerlein's use of force occurred. (*See* ECF No. 28-4, PageID.354; ECF No. 28-5, PageID.401; PageID.28-6, PageID.444.) However, Defendants claim that Plaintiff was "engaged in active resistance" when Beyerlein attempted to escort him from the secure sallyport into the booking area. (*See* ECF No. 21, PageID.101–102.)

The Sixth Circuit has defined active resistance to include "physically struggling with, threatening, or disobeying officers" and "refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (citations omitted). Typically, active resistance involves "some outward manifestation—either verbal or physical—on the part of the suspect [that] suggested volitional and conscious defiance." *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013) But active resistance does not include being compliant, having stopped resisting, or having already been detained**.** *Rudlaff*, 791 F.3d at 641 (citations omitted); *see also Wells v. City of Dearborn Heights*, 538 F. App'x 631, 638 (6th Cir. 2013) (holding that a plaintiff's attempt to turn over to see what was happening after being handcuffed "could not reasonably be viewed as anything more than passive resistance"); *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498–99 (6th Cir. 2012) ("It is well established in this Circuit that the use of non-lethal, temporarily incapacitating force on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not resisting arrest constitutes excessive force.").

21

In considering how these principles apply to Plaintiff, who was already handcuffed and in custody, the Court considers several Sixth Circuit cases involving use of force in the booking process. In *Meirthew v. Amore*, the plaintiff, who "was already arrested, handcuffed, and present in the . . . police station," refused to spread her feet for a search. 417 F. App'x at 498. In response, the officer "utilized a takedown maneuver that forcefully thrust her to the booking room floor . . . despite the fact that plaintiff was handcuffed, leaving her with no means with which to protect her face." *Id.* The court described this resistance as "minimal" and explained that "while [the plaintiff's] non-compliance may have justified *some* physical response by [the officer], the *amount* of force utilized may have been unreasonable." *Id.* (emphasis in original). The court further emphasized that "it is unreasonable to use significant force on a restrained subject, even if some level of passive resistance is presented." *Id.* at 499.

In *Harris v. City of Circleville*, an officer "yanked at a necklace [the plaintiff] was wearing using a ball point pen," and the plaintiff responded, "'Man, you don't even have to do that' and stepped back." 583 F.3d at 366. Without giving him any instruction, the officers "kicked [the

plaintiff's] leg out from under him and pushed him in the back, causing him to fall and hit his head." *Id.* While walking the plaintiff back into the booking area, the officers told him to "kneel down," used a takedown on him when he was unable to comply, and began striking him on the floor. *Id.* The Sixth Circuit concluded that "under [the plaintiff's] version of the facts, he did not actively resist at any time." *Id.*

Finally, in *Bonner-Turner v. City of Ecorse,* the plaintiff "made verbal threats against the officers from the moment he exited the patrol car at the jail" and "was spitting on the officers." 627 F. App'x 400, 412 (6th Cir. 2015). The plaintiff was otherwise compliant and allowed the officer to search him, but soon after the officer shoved "the still-handcuffed [plaintiff] face-first into the wall." *Id.* The court held that "[a] jury could find that [the officer's] use of force was objectively unreasonable" because the plaintiff "was handcuffed, not physically resisting, and, even if he had made verbal threats, a face-first shove into a wall was almost certainly gratuitous under the circumstances." *Id.*

Here, Plaintiff was vocal and argumentative but complied with the officers' instructions to get out of the patrol car, allowed Mawer to spread his feet and search him, walked up the hallway from the sallyport to the

23

second door, and stepped to the side as Beyerlein approached the door. (Beyerlein, 0:56–1:40.) Plaintiff then took one step towards Beyerlein as they continued to argue about the warrant. (*Id.* at 1:40–1:44.) As Beyerlein pushed the door to the booking area open, Plaintiff turned towards the door and began walking through. (Mawer, 0:10–16; Beyerlein, 1:44–1:48; Lautner, 3:03–3:09.) Beyerlein then placed his right hand on Plaintiff's arm. (*Id.*) In response, Plaintiff turned back toward Beyerlein and asked why Beyerlein was touching him. (Beyerlein, 1:44–1:50.)

As noted above, the videos of the ensuing initial struggle are not entirely clear. Beyerlein did not give any commands to Plaintiff as they moved into the booking area. (*See id.*) Instead, he immediately attempted to gain control over Plaintiff by lifting Plaintiff's hands and arms by the handcuffs. (ECF No. 28-4, PageID.336–337.) While Plaintiff continued to pull away and attempted to turn around towards Beyerlein, neither the videos nor the testimony in the record suggest that Plaintiff made any attempt to strike, push, or otherwise assault Beyerlein. Additionally, Beyerlein's bodycam video shows several moments during the interaction

24

where Plaintiff's hands are clearly visible and open. (Beyerlein, 1:44–1:50.)

After this brief struggle, Beyerlein immediately attempted a takedown maneuver on Plaintiff, despite the fact Plaintiff was handcuffed and unable to defend or catch himself. (Mawer, 0:14–0:17.) Nevertheless, Beyerlein immediately attempted a second takedown, slamming Plaintiff head-first into the floor. (*Id.* at 0:17–0:20; Lautner, 3:08–3:11.) While Beyerlein contends that Plaintiff grabbed his wrist and shirtsleeve in the intervening moments following the first takedown (*see* ECF No. 28-4, PageID.314–315, 337–338), Plaintiff denied that this occurred. (ECF No. 28-3, PageID.263, 267.) Even if the Court assumes that Plaintiff grabbed Beyerlein's shirt and wrist, a reasonable jury could conclude that this was a defensive and natural response to Beyerlein's first attempted takedown maneuver.

Because Plaintiff was in custody, handcuffed behind his back, within the Saginaw County Jail, surrounded by officers, and otherwise complying with commands from the officers, the Court concludes that Plaintiff's actions did not constitute active resistance. Thus, the third *Graham* factor also weighs in favor of Plaintiff.

Accordingly, the Court concludes that a reasonable jury could find that Beyerlein's use of force was objectively unreasonable.

### ii.   Clearly Established

Even if a plaintiff establishes that a constitutional right was violated, they must also show that the right "was clearly established at the time of the alleged violation." *Wright*, 962 F.3d at 864. For the right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Although a case "directly on point" is not required, there must be existing precedent that has "placed the statutory or constitutional question beyond debate." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (citation omitted).

Throughout the analysis, "the dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis in original) (quoting *al-Kidd*, 563 U.S. at 742). When evaluating existing precedent, the Sixth Circuit "look[s] first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other

26

circuits." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (citation omitted). However, the analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citation omitted). "Such specificity is 'especially important' in the Fourth Amendment excessive force context, because 'it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Gordon v. Bierenga*, 20 F.4th 1077, 1082 (6th Cir. 2021) (alteration in original) (quoting *Rivas-Villegas*, 142 S. Ct. at 8). This standard balances the "vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Creighton*, 483 U.S. at 639).

In this case, Beyerlein used a takedown maneuver on Plaintiff while he was handcuffed and surrounded by other officers in the booking area of the Saginaw County Jail. The Sixth Circuit has long held that there is a clearly established Fourth Amendment right to be free from excessive force by law enforcement officers. *Champion*, 380 F.3d at 902;

27

*Godawa*, 798 F.3d at 463. This Fourth Amendment right extends to uses of force by arresting officers during the booking process. *See Aldini*, 609 F.3d at 865 (citing *Phelps*, 286 F.3d at 300–01). Additionally, the Sixth Circuit has repeatedly held that "various types of force applied after the subduing of a suspect are unreasonable and a violation of a clearly established right." *Champion*, 380 F.3d at 902 (citing *Phelps*, 286 F.3d at 301); *see also Laplante v. City of Battle Creek*, 30 F.4th 572, 583 (6th Cir. 2022) ("We have held that takedown maneuvers are excessive when officers deal with a 'generally compliant' suspect, and that the police may not use physical force against a subdued, non-resisting subject." (citing *Smoak v. Hall*, 460 F.3d 768, 784 (6th Cir. 2006)); *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) ("[S]triking a neutralized suspect who is secured by handcuffs is objectively unreasonable."); *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009) ("'Gratuitous violence' inflicted upon an incapacitated detainee constitutes an excessive use of force, even when the injuries suffered are not substantial."); *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (emphasizing that force used "after a suspect has been incapacitated or neutralized is excessive as a matter of law"). As relevant

28

here, the Sixth Circuit has also specifically held that the use of takedown maneuvers on a handcuffed individual within the booking area of a jail or police station is objectively unreasonable. *See Meirthew,* 417 F. App'x at 498–99; *Harris,* 583 F.3d at 366–67; *Bonner-Turner,* 627 F. App'x at 412; *see also Burgess v. Fischer,* 735 F.3d 462, 474 (6th Cir. 2013) (holding that use of a takedown on a plaintiff who "was handcuffed, surrounded by four jail officials, and compliant with the orders necessary to facilitate the search" in response to offensive comment was "unreasonable and clearly established as being so"). The court has also found similar takedowns during the booking process to be objectively unreasonable, even when the individuals were not handcuffed. *See Jennings v. Fuller,* 659 F. App'x 867, 869 (6th Cir. 2016) (finding that it was clearly established that "briefly and non-threateningly lowering a hand contrary to an instruction simply does not justify a forceful takedown"). Based upon these precedents, the Court concludes that Plaintiff's right to be free from excessive force during the booking process was clearly established at the time of the alleged violation.

Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's § 1983 excessive force claim against Beyerlein is

denied. *Thompson v. City of Lebanon, Tennessee*, 831 F.3d 366, 370 (6th Cir. 2016) ("If the district court determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, it must deny summary judgment.")

### B.   Plaintiff's Assault and Battery Claim Against Beyerlein

Defendants also seek summary judgment on Plaintiff's claim for assault and battery against Beyerlein under Michigan state law. (ECF No. 1, PageID.16–18.)

"Under Michigan law an assault is 'an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery.'" *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009) (quoting *People v. Nickens*, 470 Mich. 622, 628 (Mich. 2004)). "A battery is 'an [ ]intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person.'" *Id.*

Michigan's Governmental Tort Liability Act "shields government officers from tort liability when they meet certain statutory criteria." *King v. City of Rockford*, 97 F.4th 379, 399 (6th Cir. 2024) (citing Mich. Comp. Laws § 691.1407(2)). With respect to intentional torts such as

30

assault and battery, governmental immunity protects Michigan police officers from liability only if: (1) the officer acted within the course of their employment and within the scope of their authority; (2) the officer undertook the challenged acts in good faith or without malice; and (3) "the acts were discretionary, as opposed to ministerial." *Odom v. Wayne Cnty.*, 482 Mich. 459, 480 (2008). "Governmental immunity is an affirmative defense that must be proven by the officer." *King*, 97 F.4th at 399 (citing *Odom*, 482 Mich. at 479).

Unlike the objective test for federal qualified immunity, the good-faith requirement for governmental immunity under Michigan law is subjective in nature. *See Brown v. Lewis*, 779 F.3d 401, 420 (6th Cir. 2015); *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011). In doing so, "Michigan governmental immunity 'protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.'" *Brown*, 779 F.3d at 420 (quoting *Odom*, 482 Mich. at 482). "[M]alicious intent is defined as 'conduct or a failure to act that was intended to harm the plaintiff . . . [or] that shows such indifference to whether harm will result as to be equal

31

to a willingness that harm will result.'" *Id.* (second and third alterations in original) (quoting *Odom*, 482 Mich. at 475).

In their motion, Defendants do not contest that the takedown occurred. Instead, they argue that Beyerlein's actions were legally justified because his use of force was objectively reasonable under the Fourth Amendment. (*See* ECF No. 21, PageID.101–103.) However, as set forth above, Beyerlein's use of force was not objectively reasonable. *See supra* § III(A)(i). Moreover, Defendants did not raise the affirmative defense of governmental immunity in their motion nor explain how Beyerlein acted in good faith here. *See Williams v. Godby*, 732 F. App'x 418, 425 (6th Cir. 2018) (holding that a claim of federal qualified immunity is insufficient "to invoke state-law immunity for state-tort claims"); *King*, 97 F.4th at 399 (explaining that the officer bears the burden of demonstrating governmental immunity).

Even if Defendants had properly asserted Michigan governmental immunity in their motion, summary judgment for Beyerlein on this claim would still be denied. As set forth above, Beyerlein used a takedown maneuver on Plaintiff while Plaintiff was handcuffed with his hands behind his back, within a secure area in Saginaw County Jail, and

surrounded by multiple other officers. *See supra* § I(B)–(D). Based on these circumstances, a reasonable jury could find that Beyerlein's actions were not taken in good faith and were instead done with malicious intent. *See King*, 97 F.4th at 400 (holding that a reasonable jury could conclude that officers who "applied a knee to [the plaintiff's] back after he was subdued and while he cried out repeatedly that he could not breathe" acted with malice); *Brown*, 779 F.3d at 420–21 (holding that a jury could find malicious intent where officers threw the plaintiff on the ground even though she was cooperating).

Accordingly, Defendants' motion with respect to Plaintiff's state law assault and battery claim is denied.

## C.   Plaintiff's *Monell* Claim Against the City

Finally, Defendants seek summary judgment on Plaintiff's *Monell* claim for municipal liability under § 1983 against the City. (ECF No. 21, PageID.105–106.)

Although § 1983 creates a cause of action that may only be exercised against a "person," the Supreme Court has broadly interpreted "person" to include municipalities for the purposes of § 1983 liability. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (citing *Monell v. Dep't*

33

*of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)). However, municipalities may not be held liable under § 1983 based on a theory of *respondeat superior* liability. *Id.* (quoting *D'Ambrosio v. Marino*, 747 F.3d 378, 388–89 (6th Cir. 2014)). Rather, a plaintiff must show (1) a deprivation of a constitutional right and (2) that the municipality itself caused the constitutional violation at issue. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Baynes v. Cleland*, 799 F.3d 600, 620 (6th Cir. 2015). Further, the alleged unconstitutional action must implement or execute a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. Put another way, a plaintiff "must establish that his or her constitutional rights were violated and that a policy or custom of the municipality was the 'moving force' behind the deprivation of plaintiff's rights." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 254–55 (6th Cir. 2010) (citation omitted). To show the municipality has an unconstitutional "policy or custom," a plaintiff must establish:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision[-]making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a

custom of tolerance or acquiescence of federal rights violations.

*Burgess*, 735 F.3d at 478 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

### i.   *Failure to Train*

In his response, Plaintiff frames his *Monell* claim solely based on the City's failure to train and supervise its officers.[12] (*See* ECF No. 28, PageID.217–220.) Specifically, Plaintiff contends that "the City failed to adequately train and supervise their officers after completion of the police academy, with respect to [use of] force training and policy training, including the failure to address the training given to the officers to go one level above the individual's actions and the use of force." (*Id.* at PageID.217.)

A municipality's systematic failure to adequately train police officers can constitute an unconstitutional "policy or custom" for purposes

---

[12] While Plaintiff asserts that his claim is based on both failure to train and failure to supervise, he fails to make any showing of "prior instances of unconstitutional conduct demonstrating that the municipality had ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury" as required for a failure to supervise claim. *See Wright*, 962 F.3d at 88 (quoting *Burgess*, 735 F.3d at 478). As such, the Court analyzes Plaintiff's *Monell* claim solely under a failure to train theory.

of municipal liability under § 1983. *See Miller*, 606 F.3d at 254–55. However, inadequate police training may only serve as the basis for § 1983 liability "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. Therefore, a plaintiff asserting a failure to train claim against a municipality must establish: "1) the [municipality's] training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the [municipality's] deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury." *Jackson*, 925 F.3d at 834 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)).

### a.   Whether the Training was Adequate

"When determining whether a municipality has adequately trained its employees, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'" *Jackson*, 925 F.3d at 834 (quoting *City of Canton*, 489 U.S. at 390). Several cases from the Sixth Circuit are instructive. In *Jackson v. City of Cleveland*, the plaintiffs presented testimony from former officers of the department that they had not received any relevant training. *Id.* at 835–36. Based on

36

conflicting testimony from the defendant city, the Sixth Circuit found "a genuine issue of material fact as to whether [the city's] training of its officers . . . was sufficient." *Id.* at 836. Likewise, the Sixth Circuit concluded in *Wright v. City of Euclid* that "[a] reasonable jury could find that the [c]ity's excessive-force training regimen and practices gave rise to a culture that encouraged, permitted, or acquiesced to the use of unconstitutional excessive force, and that, as a result, such force was used on [the plaintiff]." 962 F.3d at 881. In reaching this conclusion, the court considered the police department's (1) training materials that appeared to encourage the use of excessive force;[13] (2) failure to establish a training committee as required by its policy; (3) practice of "reading the use-of-force policy to the officers at rollcall until 'it is believed that all the officers have heard it' . . . followed up with a one-or-two-page quiz that may or may not be given to officers;" and (4) use of "scenario based

---

[13] These training materials included: (1) a link to a YouTube video of a Chris Rock comedy set entitled "How not to get your ass kicked by the police!"; (2) "a cartoon in which a stick figure police officer in riot gear is shown beating a prone and unarmed civilian with a club"; and (3) "a meme that depicts two officers with their guns drawn and aimed at something" that was captioned "Bed bug! Bed bug on my shoe!" *See Wright*, 962 F.3d at 880–81.

training" in which "the scenarios never changed[ ] and the officers'
performances were never evaluated." *Id.*

As in *Jackson* and *Wright*, Plaintiff has put forward sufficient
evidence that the City failed to adequately train its officers on the
appropriate use of force in a situation such as the one in this case. The
City's use-of-force policy in effect at the time of the incident stated: "In
addition to training required for firearms qualification, officers shall
receive agency-authorized training designed to simulate actual shooting
simulation and conditions and, as otherwise necessary, to enhance
officers' discretion and judgment in using deadly and non-deadly force in
accordance with this policy." (ECF No. 35-1, PageID.688.) However, there
is no evidence in the record that any such training specific to use of force
ever took place. Instead, Mawer testified that "[w]e don't do a whole lot
of training through the City but throughout the police academy, I think
it was maybe 17-weeks long, we did defensive tactics the majority of the
time." (ECF No. 28-5, PageID.396.) He further explained that the City
did not have formal use of force training and that training was conducted
solely through field training officers. (*See id.* at PageID.396–397, 399.)

Like Mawer, Beyerlein testified that he received use of force training at the academy. (ECF No. 28-4, PageID.298.) Beyerlein also indicated that he had not had any further in-service trainings on use of force. (*Id.* ("I don't know what specific courses I have been to regarding uses of force other than the less lethal different munitions that we carry.").) He further explained that he had never received training specific to the use of force on an individual who is already handcuffed. (*Id.* at PageID.299.) When questioned about the "reasonable use of force when you have a suspect who is handcuffed behind his back in the presence of more than one police officer," Beyerlein responded, "I don't know if I have ever been trained on every specific incident regarding a person handcuffed behind their back with or without officers present." (*Id.* at PageID.302–303.)

Lieutenant David Kendziorski confirmed the City's use of field training officers for use of force instruction. (ECF No. 28-11, PageID.550.) Kendziorski further testified that changes to the use of force policy would be distributed to officers and supervisors, the supervisors were expected to review the policy with the officers, and the officers would sign off that they had read the updated policy. (*Id.* at PageID.551–553.) However,

Kendziorski confirmed that the City did not conduct any training on the policy changes. (*Id.* at PageID.551–552.) He also indicated that the City did not have anyone responsible for providing ongoing use of force training to officers. (*See id.* at PageID.553–554.)

In his report, Plaintiff's use of force expert, Kenny Sanders, opined that the City's approach to training on use of force after the academy was inadequate.[14] (*See* ECF No. 28-8, PageID.476.) He explained that "[a]lthough the training records provided indicate that officers were obtaining training hours, such hours were not specific to use-of-force training and policy training, as common police practices dictate." (*Id.*) In support of this opinion, Sanders pointed to the International Association of Chiefs of Police policy on use-of-force training, which he quoted as stating:

> 1. All officers shall receive training, at least annually, on this agency's use of force policy and related legal updates.

---

[14] The Sixth Circuit has previously held that expert testimony can be especially important in the context of a failure to train claim because it "may prove the sole avenue available to plaintiffs to call into question the adequacy of a municipality's training procedures." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992) (finding an expert in police procedure offered sufficient evidence to suggest a use of force training program was constitutionally inadequate).

2.   In addition, training shall be provided on a regular and periodic basis and designed to

    1.   provide techniques for the use of and reinforce the importance of de-escalation;

    2.   simulate actual shooting situations and conditions; and

    3.   enhance officers' discretion and judgment in using less-lethal and deadly force in accordance with this policy.

3.   All use-of-force training shall be documented.

(*Id.* at PageID.479.) Defendants fail to provide any evidence to demonstrate that the City's training on use of force is adequate or respond to Sanders' opinions. As such, a reasonable jury could conclude that the City failed to adequately train its officers on use of force.

    b.   <u>Whether the Municipality was Deliberately Indifferent</u>

There are two ways for a plaintiff to show deliberate indifference. *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 287 (6th Cir. 2020) (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)). The most common way to prove deliberate indifference is to show that the municipality failed to respond to repeated complaints about constitutional violations by its officers. *Id.* "Under this approach, a

41

plaintiff must show that the defendant was aware of 'prior instances of unconstitutional conduct' such that it 'was clearly on notice that the training in this particular area was deficient and likely to cause injury' and yet 'ignored a history of abuse.'" *Id.* (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)).

The less common option to establish deliberate indifference is to "show that a municipality was deliberately indifferent by 'fail[ing] to equip law enforcement officers with specific tools to handle recurring situations.'" *Ouza*, 969 F.3d at 287 (alteration in original) (citing *Bd. Of Cnty. Comm'rs. of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). Under this theory of single-incident liability, deliberate indifference is supported "if the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it." *Id.* (citing *Connick v. Thompson*, 563 U.S. 51, 63 (2011)). Put another way, a plaintiff can establish deliberate indifference "where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations'" *Winkler v. Madison Cnty.*, 893 F.3d 877, 903 (6th Cir. 2018) (alteration in original) (quoting *Shadrick v. Hopkins Cnty.*, 805

F.3d 724, 739 (6th Cir. 2015)). The Sixth Circuit has previously explained that

> [t]he failure to provide any training on probable cause determinations or use of force (including handcuffing technique) is constitutionally inadequate. Given the frequency with which officers must evaluate probable cause and use force within the course of their duties, . . . [the city's] complete failure to provide any type of training as to these two recurring situations may amount to deliberate indifference under *City of Canton v. Harris* and its progeny.

*Ouza*, 969 F.3d at 289 (citations omitted); *see also Gregory v. City of Louisville*, 444 F.3d 725, 754 (6th Cir. 2006) (finding that a municipality's "custom of failing to train its officers on the handling of exculpatory materials is sufficient to establish the requisite fault on the part of the [c]ity"); *Shadrick*, 805 F.3d at 740–41 (holding that a reasonable jury could find deliberate indifference where the defendant's nurses did not receive ongoing training about their medical responsibilities within the jail).

Here, Plaintiff does not provide evidence of previous instances of constitutional violations, so he must proceed under a theory of single-incident liability. *See Ouza*, 969 F.3d at 287. But, as discussed above, Plaintiff has put forward evidence that the City failed to provide any

43

training on use of force beyond its initial training through field training officers. *See supra* § III(C)(i)(a). As the court found in *Ouza*, it is obvious and foreseeable that police officers will be required to routinely assess and determine the appropriate use of force, including the appropriate use of force on an individual who is already handcuffed. *See* 969 F.3d at 289. Thus, a reasonable jury could find that the City's lack of training on use of force constituted deliberate indifference.

### c. Whether the Inadequacy was Closely Related to or Actually Caused the Injury

In their reply, Defendants suggest that Plaintiff cannot show that the City's failure to train caused Plaintiff's injuries. (*See* ECF No. 37, PageID.696.) The Court does not agree. Plaintiff testified at length regarding the short-term and long-term injuries he sustained as a direct result of Beyerlein's use of the takedown on him while he was handcuffed in the booking area. (*See* ECF No. 28-3, PageID.268–278.) A reasonable jury could conclude that the City's lack of use of force training—and in particular the City's lack of training regarding use of force on handcuffed individuals—actually caused, or was closely related to, Plaintiff's injuries. *See Brown*, 520 U.S. at 409–10 ("The high degree of predictability may also support an inference of causation—that the

44

municipality's indifference led directly to the very consequence that was so predictable.").

Accordingly, the Court denies Defendants' motion with respect to Plaintiff's *Monell* claim.

## IV.   Conclusion

For the reasons set forth above, Defendants' motion for summary judgment (ECF No. 21) is DENIED.

The Clerk's Office is DIRECTED to update the docket to reflect the proper party in this case. Defendant "Officer Jonathan Bayerlein" should be changed to "Jonathon Beyerlein".

IT IS SO ORDERED.

Dated: June 20, 2024          s/Judith E. Levy
Ann Arbor, Michigan          JUDITH E. LEVY
                             United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 20, 2024.

                             s/William Barkholz
                             WILLIAM BARKHOLZ
                             Case Manager